07-4772-bk (L)

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2008

Docket Nos. 07-4772-bk (L); 07-4843-bk (CON); 07-4845-bk (CON); 07-4865-bk (XAP); 07-4872-bk (CON); 07-4874-bk (CON); 07-4964-bk (XAP); 07-5018-bk (XAP); 07-5019-bk (CON); 07-5043-bk (CON); 07-5049-bk (CON)

Argued: November 14, 2008                    Decided: March 26, 2010

_____

IN RE: WESTPOINT STEVENS, INC.,

*Debtor*.

**************************************************************

CONTRARIAN FUNDS LLC, SATELLITE SENIOR INCOME FUND, LLC, CP CAPITAL INVESTMENTS, LLC, WAYLAND DISTRESSED OPPORTUNITIES FUND I-B, LLC, WAYLAND DISTRESSED OPPORTUNITIES FUND I-C, LLC, BEAL BANK, S.S.B.,

*Appellees-Cross-Appellants*,

- v.-

ARETEX LLC, WESTPOINT INTERNATIONAL, INC., WESTPOINT HOME, INC., WILMINGTON TRUST COMPANY, as Agent for the Second Lien Lenders,

*Appellants-Cross-Appellees*,

PERRY PRINCIPALS LLC, GSC PARTNERS, PEQUOT CAPITAL MANAGEMENT,

*Appellees*.

_____

Before:  MINER, HALL, and LIVINGSTON, <u>Circuit Judges</u>.[*]

---

[*] Two of the members of the original panel have been replaced.  Honorable Robert A. Katzmann recused himself prior to the oral argument, and Honorable Sonia Sotomayor was elevated to the United States Supreme Court on August 8, 2009.  Accordingly, Honorable Peter W. Hall and Honorable Debra Ann Livingston have been designated as members of the panel. <u>See</u> Second Circuit Internal Operating Procedure E(b).

Appeal and cross-appeal from orders entered on November 16, 2005, and October 9, 2007, in the United States District Court for the Southern District of New York (Swain, J.), (1) reversing orders of the Bankruptcy Court (Drain, J.) (a) approving the distribution of unregistered securities and subscription rights in satisfaction of liens held by senior secured creditors; and (b) permitting the distribution of the remaining subscription rights to junior secured creditors; and (2) affirming the order of the Bankruptcy Court releasing certain escrowed adequate protection payments to the junior secured creditors.

Reversed in part and affirmed in part.

BRUCE BENNETT, SIDNEY P. LEVINSON, and Joshua M. Mester, Hennigan, Bennett & Dorman LLP, Los Angeles, California, for appellees-cross-appellants Contrarian Funds LLC, Satellite Senior Income Fund LLC, CP Capital Investments, LLC, Wayland Distressed Opportunities Fund I-B, LLC, Wayland Distressed Opportunities Fund I-C, LLC.

Gregory G. Hesse, Hunton & Williams, Dallas, Texas, (Richard P. Meth, Day Pitney LLP, Florham Park, New Jersey), for appellee-cross-appellant Beal Bank, S.S.B.

PHILIP A. LACOVARA, Andrew H. Schapiro, Kenneth E. Noble, and Daniel B. Kirschner, Mayer Brown LLP, New York, New York, (Peter D. Wolfson, Richard M. Zuckerman, Jo Christine Reed, Sonnenschein Nath & Rosenthal LLP, New York, New York), for appellants-cross-appellees Aretex LLC, WestPoint International, Inc., WestPoint Home, Inc.

P. BRADLEY O'NEILL and Thomas M. Mayer, Kramer Levin Naftalis & Frankel LLP, New York, New York, for appellant-cross-appellee Wilmington Trust Company, as agent to the Second Lien Lenders.

MINER, Circuit Judge:

In this bankruptcy proceeding, secured creditor, Aretex LLC ("Aretex"), and its affiliates, WestPoint International, Inc. ("WestPoint International") and WestPoint Home, Inc. ("WestPoint Home"), collectively, "Aretex Group," and Wilmington Trust Co. ("Wilmington Trust"), the administrative agent for the junior secured creditors, appellants-cross-appellees in this matter, appeal principally from orders entered on November 16, 2005, and October 9, 2007, in the United States District Court for the Southern District of New York (Swain, J.). The District

Court reversed the orders of the Bankruptcy Court (Drain, J.) permitting (1) the distribution of unregistered securities and subscription rights to satisfy the liens held by senior secured creditors and (2) the distribution of the remaining subscription rights to junior secured creditors. Objecting senior secured creditors, Contrarian Funds, LLC ("Contrarian Funds"), Satellite Senior Income Fund, LLC ("Satellite Fund"), CP Capital Investments, LLC ("Capital Investments"), Wayland Distressed Opportunities Fund 1-B, LLC ("Distressed Funds I"), Wayland Distressed Opportunities Fund 1-C, LLC ("Distressed Funds II"), collectively, the "Contrarians," and Beal Bank, S.S.B. ("Beal Bank"), the administrative agent and collateral trustee for the senior secured creditors, appellees-cross-appellants in this matter, cross-appeal, inter alia, from the orders of the District Court to the extent that they affirm the Bankruptcy Court's order of adequate protection payments to the junior secured creditors.

## I.    BACKGROUND

WestPoint Stevens, Inc. (the "Debtor") is a domestic company engaged in the manufacture and distribution of textiles.[1]  Beginning in or about 2000, due to "an overleveraged debt structure and an increase in foreign competition," the Debtor faced financial difficulties that required substantial sacrifices in regard to its operations and workforce.  Over the next several years, the Debtor initiated business strategies to improve its ailing financial health — but to no avail.  By 2003, the Debtor concluded that it would be in the best interests of its creditors and shareholders to effectuate a consensual reorganization under the Bankruptcy Code.  Accordingly, on June 1, 2003, the Debtor commenced bankruptcy proceedings by filing a petition pursuant to Chapter 11 of the Bankruptcy Code.

Shortly after the commencement of bankruptcy proceedings, the Debtor, with the

---

[1]  In addition to WestPoint Stevens, Inc., the debtors in this bankruptcy case are comprised of several affiliated entities, namely, WestPoint Stevens Inc. I, WestPoint Stevens Stores, Inc., J.P. Stevens Enterprises, Inc., and J.P. Stevens & Co., Inc.  See generally In re WestPoint Stevens, Inc., 333 B.R. 30, 33 (S.D.N.Y. 2005).  We will refer to the debtors in this case as one entity in the singular form, the "Debtor."

approval of the Bankruptcy Court, obtained further financing from post-petition creditors to preserve its business as a going concern. As a condition for obtaining the post-petition financing, the Bankruptcy Court ordered the Debtor to make adequate protection payments to both the senior and junior secured creditors as protection from the diminishing value of their collateral. While plans for reorganization were being discussed, however, the Bankruptcy Court's adequate protection order was challenged by a majority of the senior secured creditors who sought to end the adequate protection payments to the junior secured creditors. The matter was temporarily resolved by a stipulation, requiring the placement of further distributions of adequate protection payments to the junior secured creditors into an escrow account until the occurrence of certain events relating to the reorganization or sale of the Debtor's business.

Eventually, it became apparent to the Debtor that reorganization was not a realistic solution to its financial woes. According to the Debtor, the proposed plans for reorganization were rejected because the Contrarians and Aretex — creditors of the Debtor and holders of the majority of the secured liens — each "insist[ed] on controlling the restructured Debtor[] and [were] unable to reach a compromise on such issue." The principal investor in the Contrarians was Wilbur L. Ross Jr., and the principal investor in Aretex was Carl C. Icahn. See In re WestPoint Stevens, Inc., 333 B.R. 30, 34 (S.D.N.Y. 2005). After almost two years of failed attempts at reaching a consensus on a plan for reorganization, the Debtor and its advisors concluded that a sale of its assets pursuant to 11 U.S.C. § 363(b) "[was] the only viable option available to preserve [its] business operations and provide a meaningful recovery to [its] secured creditor constituencies." Accordingly, an auction was held on June 23, 2005, for substantially all of the Debtor's assets, and Aretex emerged as the winning bidder following a heated competition with the Contrarians. Despite their initial objections, the Contrarians stipulated to allow the sale to close. Thereafter, pursuant to the terms of the sale and the Bankruptcy Court's accompanying sale order, the Debtor's assets were transferred, free and clear of liens, to WestPoint Home and in effect to WestPoint International — Aretex's vehicle corporations for the acquisition of the

Debtor's business — and WestPoint International's securities were distributed to the Debtor's secured creditors for the purpose of satisfying their liens. The terms of the sale also required other distributions and the purchase of additional stocks, permitting Aretex to become the majority shareholder of WestPoint International. Aretex used its majority ownership to elect WestPoint International's board of directors, and WestPoint International has since been operating the Debtor's business for several years. Subsequent to the closing, the Bankruptcy Court also ordered the adequate protection payments held in escrow to be released to the junior secured creditors.

Acting in its capacity as an appellate court in this bankruptcy proceeding, the District Court affirmed the Bankruptcy Court's release of adequate protection payments to the junior secured creditors; however, notwithstanding the closing of the sale, the District Court reversed the Bankruptcy Court's orders in certain respects affecting Aretex's control of the Debtor's business. This appeal presents two principal issues: (1) whether the District Court had authority to modify portions of the terms of the sale affecting Aretex's control of the Debtor's business where (a) acquisition of control was the primary purpose of the sale, (b) the sale between Aretex and the Debtor had already closed, (c) there is no order in place staying the closing of the sale, and (d) the parties do not contest that the sale was completed in good faith; and (2) whether the adequate protection payments held in escrow were properly released to the junior secured creditors. For the reasons that follow, we reverse the orders of the District Court as it relates to the first issue and affirm as it relates to the second. The following subsections, Part I(A)–(G), present in further detail the essential facts of this case.

A.     The Debtor's Secured Creditors

The Debtor's creditors consist of, among others, the First Lien Lenders and the Second Lien Lenders. The First Lien Lenders are senior secured creditors who have liens on the Debtor's assets having a value of approximately $488 million. The Second Lien Lenders are junior secured creditors who have liens on the same assets having a value of approximately $165

5

million. The Contrarians hold a majority share of the liens held by the First Lien Lenders, approximately 54%, but hold none of the liens held by the Second Lien Lenders. Aretex holds a minority share of the liens held by the First Lien Lenders, approximately 40%, and also holds a majority of the liens held by the Second Lien Lenders, approximately 51%. Beal Bank is the administrative agent and collateral trustee of the First Lien Lenders, and Wilmington Trust is the administrative agent for the Second Lien Lenders.

Before the commencement of bankruptcy proceedings, on June 29, 2001, the First and Second Lien Lenders entered into an Intercreditor and Lien Subordination Agreement (the "Intercreditor Agreement"), which provided, inter alia, that "[u]ntil all First Lien Indebtedness has been paid in full in cash . . . the Second Lien Lenders shall not be entitled to . . . exercise any rights or remedies with respect to the Second Priority Liens or the Collateral . . . ." The Intercreditor Agreement provided for several exceptions, two of which were that the Second Lien Lenders might receive (1) adequate protection payments and (2) permitted mandatory prepayments. In particular, the Intercreditor Agreement defined "permitted mandatory prepayments" as including payments to the Second Lien Lenders "occurring as a result of [the Debtor's] sale . . . of the Collateral . . . to the extent that . . . any net proceeds of such sale . . . remain after application to the First Lien Indebtedness to the extent required by the Senior Credit Agreement."

Shortly after the commencement of bankruptcy proceedings, on June 18, 2003, the Bankruptcy Court entered an order granting adequate protection payments to both the First and Second Lien Lenders (the "Adequate Protection Order"). This order was entered contemporaneously with the Bankruptcy Court's authorization to permit post-petition lenders, who are unrelated to either the First or Second Lien Lenders or any other pre-petition creditors, to obtain priming liens on the Debtor's assets.[2] In return for the priming liens, the Debtor received

---

[2] A priming lien is a "new lien on property that is given priority over existing liens." Alvin L. Arnold, The Arnold Encyclopedia of Real Estate 438 (2d ed. 1993). Thus, here, the

6

financing from the post-petition lenders, thus allowing the Debtor to maintain its business as a going concern and avoid an imminent dissolution before a plan of reorganization could be confirmed. The Adequate Protection Order sought to provide protection to the pre-petition secured creditors by ordering the Debtor to pay them amounts relating to the diminution in value of the collateral being used by the Debtor to maintain its business as a going concern. Neither the First nor the Second Lien Lenders initially objected to the Adequate Protection Order, which provided protection for both classes of pre-petition secured creditors.

In a motion dated July 22, 2004, however, a member of the First Lien Lenders group, supported by the Contrarians and therefore representing a substantial majority of the First Lien Lenders (the "Objecting First Lien Lenders"), moved for a grant of additional adequate protection to the First Lien Lenders through the termination of the adequate protection payments to the Second Lien Lenders. The Objecting First Lien Lenders claimed that they had been misinformed about the Debtor's value at the time the Adequate Protection Order was entered and argued that, having been properly informed of the status of the Debtor's business, there was insufficient value in the Debtor to justify adequate protection payments to the Second Lien Lenders.

On August 18, 2004, the Objecting First Lien Lenders and the Second Lien Lenders entered into a stipulation providing for the deposit of the Second Lien Lenders' adequate protection payments into an escrow account until the occurrence of certain events relating to the reorganization or sale of the Debtor's business (the "Escrow Stipulation"). In return, the Objecting First Lien Lenders agreed to withdraw their motion to terminate adequate protection payments to the Second Lien Lenders. The Escrow Stipulation expressly provided, "[f]or avoidance of doubt," that the adequate protection payments held in escrow "shall not constitute . . . payments made . . . as adequate protection to the Second Lien Lenders . . . unless and until [the court] authorizes the release of funds . . . to the Second Lien Agent for application to claims

---

priming liens would have priority over the liens of both pre-petition secured creditors, namely, the First and Second Lien Lenders.

7

held by the Second Lien Lenders." (quotation marks omitted).

B.    Initial Skirmishes Relating to the Sale

On March 9, 2005, the Debtor filed a motion with the Bankruptcy Court requesting authorization to sell substantially all of its assets free and clear of liens, claims, encumbrances, and other interests through an auction.  The Debtor explained that it had attempted to reach a consensus among its creditors on the terms of a Chapter 11 plan of reorganization but that such efforts were "blocked" by either the Contrarians or Aretex.  According to the Debtor, "both [the Contrarians] and [Aretex] demand control of the restructured Company and they have been unable to reach a compromise, even with the assistance of the Debtor[]."  The Debtor also stated that, in light of the impasse, both the Contrarians and Aretex had informed the Debtor that it "should consider pursuing a sale pursuant to section 363(b) of the Bankruptcy Code."  The Debtor asserted in its motion that, "[a]fter an extensive review of the available options," a sale of its assets was "the only viable option available to preserve [its] business operations and provide a meaningful recovery to [its] secured creditor constituencies."

The Debtor informed the Bankruptcy Court that it had solicited bids to enter into a "stalking horse" contract in preparation for the auction.[3]  Both Aretex and the Contrarians had competed to become the stalking horse, and the Debtor eventually selected the Contrarians as the winning bidder.  Under the terms of the stalking horse contract, the Contrarians, as majority members of the First Lien Lenders group, would direct Beal Bank to make a "credit bid" to purchase the Debtor's assets free and clear of encumbrances.  That is, the entire value of the First Liens, approximately $488 million, would be used as credit to purchase the Debtor's assets.  Thereafter, the Contrarians would exchange securities in New Textile Co., a corporation the Contrarians created for purposes of acquiring the Debtor's business, for the assets purchased through Beal Bank.  The securities of New Textile Co. would then be distributed to the First Lien

---

[3]  A "stalking horse" contract is a first, favorable bid strategically solicited by the bankrupt company to prevent low-ball offers.

Lenders as consideration.

Of course, the stalking horse contract was not a binding contract of sale and only served to fix the minimum bid at the auction. The Debtor explained in its motion to proceed with the auction sale that the Contrarians' bid represented "the most attractive alternative available . . . at this time." The Contrarians filed a separate response, asserting that (1) its credit bid was equivalent to a cash bid, and (2) any competing bids therefore were required to offer a sufficient amount of cash to pay the First Lien Lenders in full.

On April 7, 2005, following a hearing on the Debtor's motion, the Bankruptcy Court denied the Debtor's motion on several grounds, including the unreasonableness of the breakup fees. The Debtor filed a subsequent motion on April 15, 2005, purporting to address the Bankruptcy Court's concerns by removing references to the stalking horse contract and breakup fees. The Contrarians opposed the Debtor's modified motion to proceed with the sale because, among other reasons, the proposed timetable for the auction was insufficient for any potential third parties to obtain financing. The Contrarians asserted that, pursuant to 11 U.S.C. § 363(k) and the Intercreditor Agreement, only they — and not any other party, including, specifically, Aretex — could purchase the Debtor's assets "with stock rather than cash" without first satisfying the First Lien Lenders in cash. Notwithstanding the Contrarians' objections, the Bankruptcy Court, on April 22, 2005, granted the Debtor's motion and authorized the auction of the Debtor's assets to proceed. The Bankruptcy Court did not rule prior to the auction on the superiority of the Contrarians' credit bid or on the issue of whether any other bid must first satisfy the First Lien Lenders in cash.

In response to the Bankruptcy Court's order approving the auction of the Debtor's assets to proceed, Wilmington Trust, as agent of the Second Lien Lenders, on May 10, 2005, filed a motion to release the adequate protection payments held in escrow pursuant to the Escrow Stipulation so that it could distribute the escrowed funds to the Second Lien Lenders. Aretex joined Wilmington Trust's motion to release the escrowed adequate protection payments to the

9

Second Lien Lenders. Beal Bank, as collateral trustee of the First Lien Lenders, objected to Wilmington Trust's motion on the grounds that the motion was premature because the auction of the Debtor's assets had not yet even occurred. The Contrarians also objected to Wilmington Trust's motion, arguing that the Second Lien Lenders were not entitled to the escrowed funds because the funds were not adequate protection payments at all and therefore were subject to the subordination clauses of the Intercreditor Agreement. The ensuing reply and subsequent hearing in regard to that dispute occurred after the auction and the entry of the Bankruptcy Court's sale order.

C.     The Bid for Control of the Debtor's Business

The auction was held on June 23, 2005. To solicit bids, the Debtor contacted 111 potential bidders and published a notice of sale in the Wall Street Journal and The New York Times. At the auction, however, the Contrarians and Aretex were the only two parties present.

The auction commenced with Aretex's bid being the baseline bid, which, applying a control premium of 25.8%, was valued at approximately $617.1 million.[4] Aretex's bid structure essentially was composed of securities of WestPoint International for consideration, with an additional payment of $165 million cash for a 17.5% interest in WestPoint International. In response to Aretex's bid, the Contrarians submitted a provisional bid valued at approximately $621.6 million.[5] The Contrarians' provisional bid structure differed from Aretex's, in that it was composed of a credit bid by Beal Bank and a subsequent exchange of securities in New Textile Co. — the vehicle corporation created by the Contrarians to acquire the Debtor's business — for the assets purchased by the credit bid. This bid structure was generally identical to the

---

[4] The "control premium" is the rate at which the value of the bid is discounted to account for the bidder's purchase of control of the business. Thus, for instance, Aretex's initial bid may have yielded a total value of approximately $940 million, but, with the application of the 25.8% control premium as part of the assessment of the bid, Aretex's bid was valued at $617.1 million.

[5] The Contrarians' credit bid was provisional because, at the time of the auction, Beal Bank had not yet agreed to credit bid for the Debtor's assets. Beal Bank had indicated, however, that it had no reason to believe that it would not follow the Contrarians' direction to credit bid.

Contrarians' stalking horse proposal. The Contrarians indicated that, upon their taking control of New Textile Co., they were "prepared to provide minority [shareholder] protections."

After some disagreement about whether a provisional bid should be permitted to compete with Aretex's unconditional bid, Aretex submitted a new bid raising its purchase price for a 17.5% interest in WestPoint International to $170 million — an increase of $5 million. This new bid was valued, applying the control premium of 25.8%, at approximately $639.8 million. Unlike the Contrarians, Aretex indicated that its bid would not provide "minority [shareholder] protections other than what is required by law." Thereafter, the Contrarians asserted that they would continue to bid; however, in the event they did not emerge the winning bidder, they reserved the right to argue that their initial provisional bid "was higher and better." The Contrarians accordingly set aside their credit bid and bid in a structure identical to that proposed by Aretex, except that the Contrarians would purchase 7.75% of the stock of New Textile Co., the Contrarians' vehicle company (as opposed to Aretex's purchase of 17.5% of WestPoint International, Aretex's vehicle company), to secure control of the Debtor's business; the Contrarians new bid was valued at approximately $650.1 million. Aretex then submitted a bid that increased its purchase price for 17.5% interest in WestPoint International to $180 million, raising the value of its entire bid to approximately $677.3 million.

The Contrarians responded by raising their bid but emphasizing that "when [the] dust all settles, we must end up with 50.1 [percent;] that is obviously incorporated into our proposal." The Debtor rejected the bid because it was not able to confirm that it could "meet the condition that the [Contrarians] would retain 50.1 percent of the ownership of [New Textile Co.]." The Contrarians protested that obtaining a controlling interest in the vehicle company acquiring the Debtor's business was "one of [Aretex's] conditions for their bid." The Debtor explained that Aretex "can meet the condition based on their [bid] structure. . . . [However,] based on how we evaluated your [(the Contrarians')] bid, we cannot meet the 50.1 [percent] minimum condition." The Contrarians then ceased to bid.

Aretex responded by increasing its bid once more, raising its purchase price for 17.5% interest in WestPoint International to $187 million and thus raising the value of its entire bid to approximately $703.5 million. Apparently dissatisfied with lawyers placing unnecessary provisions in the bids, Carl Icahn, on behalf of Aretex, indicated that the provision protecting "any right [of Aretex] to buy additional shares [to guarantee control over WestPoint International]" would be stricken. As explained in a subsequent hearing, Aretex stated that it was "comfortable with the math [that it would own more than 50% of WestPoint International]." The auction accordingly concluded with Aretex emerging as the winning bidder. The Debtor and Aretex thereafter prepared an Asset Purchase Agreement incorporating the terms of the sale in accordance with the bid.

In the subsequent hearings held on June 24, 2005, and June 29, 2005, the Debtor sought to have the Asset Purchase Agreement approved by the Bankruptcy Court. After hearing testimony from witnesses and observing that the auction was well-publicized, open, fair, and between sophisticated parties, each with their own professional advisors, the Bankruptcy Court approved Aretex's purchase of "substantially all the [Debtor's] assets, in effect of the [Debtor's] business."

D.    The Bankruptcy Court's Sale Order and the Contrarians' Appeal to the District Court

On July 8, 2005, the Bankruptcy Court entered its Order Authorizing Sale of Substantially All of the Sellers' Assets Free and Clear of Liens, Claims, Encumbrances and Interests, the Assumption of Certain Liabilities, Approval of Successful Bidder and Certain Related Matters (the "Sale Order"). The Sale Order confirmed that the winning bid presented "the highest and best bid at the Auction" and that the auction was conducted lawfully and in a "noncollusive, fair, and good faith manner."

The Sale Order approved the Asset Purchase Agreement, which provided a two-step process in the sale of the Debtor's assets. First, the Debtor's assets would be acquired by

WestPoint Home, a wholly owned subsidiary of WestPoint International, "free and clear" of liens and encumbrances; however, replacement liens would be placed on WestPoint International's securities to account for the secured creditors' interests. Second, at closing, WestPoint International's securities would be directly distributed to the secured creditors, thereby extinguishing the replacement liens. This second step, in conjunction with Aretex's purchase of a 17.5% interest, worked to guarantee Aretex control of WestPoint International and, by extension, the Debtor's business. Because these steps would occur simultaneously at closing, however, "although it might be a two step process, it can only be metaphysically a two step process." In re WestPoint Stevens, Inc., 333 B.R. at 51 (quoting the Bankruptcy Court). The securities to be distributed to the First Lien Lenders were parent shares and subscription rights to WestPoint International (the "First Securities"). The remaining subscription rights, the value of which were calculated at the time of closing and found to be worth approximately $95 million (the "Second Securities"), were to be distributed to the Second Lien Lenders.

The Contrarians appealed the Sale Order to the District Court.[6] After filing the notice of appeal, the Contrarians moved to stay the Sale Order in the Bankruptcy Court. The Bankruptcy Court denied the stay motion, and the Contrarians, joined by Beal Bank, thereafter filed a stay motion with the District Court. The Contrarians submitted their brief arguing the merits of the appeal to the District Court, but the parties then agreed to a stipulation (the "Stay Stipulation"), which narrowed the issues on appeal. Specifically, the Stay Stipulation provided for the withdrawal of the Contrarians' stay motion, with prejudice, as to "that portion of the [stay motion] seeking a stay of the closing of the sale by [the Debtor] to Purchasers approved by the [Sale Order]." The Contrarians also agreed that it would "seek no other stay of the closing of the sale under the Sale Order or otherwise."

---

[6] The Contrarians did not challenge the value of the distributed Securities as determined by the Bankruptcy Court. See generally In re WestPoint Stevens, Inc., 333 B.R. 30 (S.D.N.Y. 2005). Those findings remain uncontested in this appeal.

The Stay Stipulation expressly provided, however, for a stay of "the distribution of the [Second Securities] allocable to the Second Lien Lenders." In particular, the Stay Stipulation required that the Second Securities be distributed to the Second Lien Lenders but that such distribution be held in escrow until a subsequent court order resolved the proper allocation, if any, of the Second Securities to the First Lien Lenders. The Stay Stipulation provided that "[i]n all other respects," the distribution of the Second Securities "shall be in accordance with the Sale Order and terms of the Asset Purchase Agreement." The Stay Stipulation also provided that, except as set forth in the Stay Stipulation, "the rights of all parties . . . as to the appeal and all other disputes and matters . . . including without limitation rights under Paragraph R of the Sale Order, are expressly preserved and are not affected by this stipulation." Paragraph R of the Sale Order included the Bankruptcy Court's conclusion that the exceptions to the subordination clauses of the Intercreditor Agreement, i.e., the permitted mandatory prepayments and adequate protection, authorized the Second Lien Lenders to receive the Second Securities.[7] The Stay Stipulation recited that the minority members of the Second Lien Lenders group did not favor the stipulation and that it was being entered over their objection.

Several days after the Stay Stipulation was "so ordered" by the District Court, on August 8, 2005, the Debtor and Aretex Group closed the sale. Accordingly, the Debtor's assets were transferred, free and clear of liens, to WestPoint International; the securities allocated to the First Lien Lenders were distributed to the First Lien Lenders in satisfaction of their liens; and the Second Securities allocated to the Second Lien Lenders were placed in escrow pursuant to the Stay Stipulation. Thereafter, Aretex purchased 17.5% of WestPoint International's shares for

_____

[7] To prevent confusion, we note at this juncture that "adequate protection" makes two distinct appearances in this case. First, there are the "adequate protection" payments held in escrow pursuant to the Escrow Agreement. That adequate protection compensated for the diminishing value of the secured collateral resulting from the Debtor's use of the collateral in maintaining its business as a going concern. Second, there is the "adequate protection" that the Bankruptcy Court uses as a justification to distribute the First Securities to the First Lien Lenders in satisfaction of their claims and thus permit the distribution of the Second Securities to the Second Lien Lenders. We discuss the validity of each infra Part II(D)(2), (E).

14

$187 million pursuant to its bid and also exercised the subscription rights distributed to it as a First Lien Lender, paying $32.8 million for additional common stock in WestPoint International. Thus, in addition to the stock distributed to it pursuant to the Asset Purchase Agreement and Sale Order, Aretex's purchase of stock and exercise of subscription rights rendered it the controlling shareholder of WestPoint International. As the controlling shareholder, Aretex elected WestPoint International's board of directors.

E.    The District Court's November 16, 2005 Decision and Order Remanding The Case To The Bankruptcy Court

In a published decision and order dated November 16, 2005, the District Court reversed, in part, the Bankruptcy Court's Sale Order and remanded the case for further proceedings. See In re WestPoint Stevens, Inc., 333 B.R. at 54–55. The District Court initially dismissed as moot, pursuant to 11 U.S.C. § 363(m), any claims that it believed challenged the validity of the closed sale. Id. at 40. The District Court rejected, inter alia, the Contrarians' argument that the First Securities should have been distributed to Beal Bank (as the collateral trustee of the First Lien Lenders) and not directly to the First Lien Lenders. Id. The District Court reasoned that such a distribution would "vitiate the purpose of the Aretex . . . Group bid" because, if the First Securities were distributed to Beal Bank — which is controlled by the Contrarians — "that would be tantamount to declaring the [Contrarians] the winner of the auction." Id. (quoting the Bankruptcy Court).

The District Court concluded, however, that the Stay Stipulation staying the allocation of the Second Securities had in fact "stayed the claim satisfaction and lien release provisions of [the Sale Order]" and, accordingly, the question of whether the distribution of the First Securities to the First Lien Lenders had satisfied their liens remained open for adjudication, unobstructed by the mandatory mootness provision of 11 U.S.C. § 363(m). See id. at 40, 51. Inasmuch as Aretex Group argued, in the alternative, that any challenge that would unwind the lien release and claim-satisfaction provisions of the Sale Order should be equitably moot because those provisions were

15

necessary for Aretex to maintain control over WestPoint International, the District Court found that equity did not favor Aretex. Id. at 41. "[S]uch [a] result is not inequitable as Aretex and its affiliates retain the ability to acquire more equity by purchase and . . . they chose to close the transaction [despite the Stay Stipulation staying the distribution of the Second Securities and] . . . the Objecting First Lien Lenders' consistent argument that non cash consideration would be insufficient to satisfy the Debtor['s] obligations to them." Id.

Having set the parameters for its review of the Bankruptcy Court's decision, the District Court rejected, as without merit, the remaining preliminary arguments raised by Aretex Group. See id. at 41–43. In particular, the District Court noted that the Contrarians were not estopped from challenging Aretex's bid structure despite the Contrarians having submitted bids that were purportedly identical in structure to Aretex's bid during the auction. Id. According to the District Court, this disparity in treatment was proper because the Contrarians, as majority holders of the First Liens, were in a position to forego having the First Lien Lenders' claims satisfied in cash while Aretex, as only a minority holder of the First Liens, did not have this option to act on behalf of the First Lien Lenders. Id.

The District Court then concluded that there was no contractual basis for authorizing the distribution of the Second Securities to the Second Lien Lenders. Specifically, it concluded that none of the exceptions to the subordination clauses of the Intercreditor Agreement, namely, the payment of adequate protection or permitted mandatory prepayments, justified the Second Lien Lenders' receiving the Second Securities without the First Lien Lenders having been satisfied first in full and in cash. See id. at 45–49.

The District Court also concluded that there was no statutory basis for authorizing the lien release and claim-satisfaction provisions of the Sale Order. Id. at 50–54. The District Court noted that such provisions were beyond the scope of 11 U.S.C. § 363(b) and found that the Bankruptcy Court's determinations circumvented the procedural safeguards of a Chapter 11 reorganization. Id. at 52. The District Court stated that the reserved equitable powers of the

16

Bankruptcy Court under 11 U.S.C. § 105(a) could not justify the lien release and claim-satisfaction provisions of the Sale Order because the Bankruptcy Court's equitable powers could not be used in contravention to the Bankruptcy Code. Id. at 53–54. Accordingly, the District Court remanded the case to the Bankruptcy Court. Id. at 54–55. Aretex Group thereafter moved in the District Court for certification of an interlocutory appeal to this Court, but that motion was denied on January 25, 2006. In re WestPoint Stevens, Inc., No. 05 Civ. 6860, motion denied (S.D.N.Y. Jan. 25, 2006). Aretex Group then filed a petition for a writ of mandamus in this Court to direct the District Court to vacate its decision, but we denied that petition on March 16, 2006. In re Aretex, LLC, et al., No. 06-0483, petition denied (2d Cir. Mar. 16, 2006).

F.     The Bankruptcy Court's Orders on Remand

On remand from the District Court, the Bankruptcy Court issued two orders, one implementing the District Court's decision, and one releasing the adequate protection payments held in escrow pursuant to the Escrow Stipulation to the Second Lien Lenders. Both orders were entered on April 13, 2006.

1.     Order Implementing Decision

After submission of briefs and oral argument, the Bankruptcy Court issued its Order on Remand implementing the District Court's decision. The Bankruptcy Court ordered that the Securities, i.e., the First Securities and the Second Securities, including those securities and subscription rights already distributed to Aretex, be distributed instead to the collateral trustee of the First Lien Lenders, Beal Bank. The Bankruptcy Court noted, however, that the 17.5% of WestPoint International's securities purchased by Aretex "do not constitute Replacement Collateral [(the Securities)] and are not subject to any liens of the First Lien Lenders or the Second Lien Lenders." The Bankruptcy Court further ordered, inter alia, that Aretex, inasmuch as it was a First Lien Lender, would share in the proceeds realized from the disposition of the Securities with the Objecting First Lien Lenders on a pro rata basis. Likewise, Aretex, inasmuch as it was also a Second Lien Lender, would share in the proceeds realized from the disposition of

17

the Securities with the Second Lien Lenders on a pro rata basis. The Bankruptcy Court denied Aretex Group's request to supervise the sale of the Securities.

In a separate order entered the same day, the Bankruptcy Court granted Aretex Group's motion to stay the court's Order on Remand.

2.          Order Releasing Adequate Protection Payments

In its Release Order, the Bankruptcy Court granted Wilmington Trust's motion to release the adequate protection payments, in the amount of approximately $29 million, held pursuant to the Escrow Stipulation. The Bankruptcy Court found that the First Lien Lenders had received their adequate protection payments but that the Second Lien Lenders, on account of the Escrow Stipulation, had been deprived of adequate protection payments to which they were entitled.

The Bankruptcy Court observed that the Adequate Protection Order was entered in light of uncontested evidence that there was sufficient value in the Debtor's assets to secure both the First and Second Lien Lenders. In addition, the Bankruptcy Court noted that the Adequate Protection Order reserved the right of the First Lien Lenders to file an adversary proceeding to alter the Second Lien Lenders' right to adequate protection payments and, further, reserved the right of all secured creditors to seek additional adequate protection, but that the Objecting First Lien Lenders had not filed any action to challenge the Second Lien Lenders' right to receive adequate protection payments. Even if the Objecting First Lien Lenders had successfully challenged the Second Lien Lenders' right to adequate protection, the Bankruptcy Court noted that any such challenge would only have resulted in the accumulated adequate protection payments being allocated to satisfy the principal, rather than the interest, on the Second Lien debt. Insofar as the Objecting First Lien Lenders argued for additional adequate protection by terminating the adequate protection afforded to the Second Lien Lenders, the Bankruptcy Court rejected this argument as inconsistent with the law and the Adequate Protection Order.

The Bankruptcy Court also rejected the Objecting First Lien Lenders' argument that the funds held pursuant to the Escrow Stipulation were subject to the subordination clauses of the

18

Intercreditor Agreement. The Bankruptcy Court stated that the Escrow Stipulation did not terminate the Second Lien Lenders' rights to adequate protection payments; rather, the Escrow Stipulation "simply deferred and conditioned the delivery of the [adequate protection payments] on the entry of a further Court order." The Bankruptcy Court also stated that the Intercreditor Agreement, which it concluded remained binding, expressly provided for the Second Lien Lenders' right to receive adequate protection payments and that "the entry of this Order suffices to qualify the [adequate protection payments held in escrow] for the exception in the Intercreditor Agreement." Accordingly, finding no merit to the objections made to Wilmington Trust's motion, the Bankruptcy Court entered the Release Order permitting Wilmington Trust to receive the adequate protection payments held in escrow.

G.     The District Court's October 9, 2007 Decision and Order Affirming The Bankruptcy Court's Order on Remand and Release Order

In an unpublished decision and order dated October 9, 2007, the District Court affirmed the Bankruptcy Court's Order on Remand and Release Order. See In re WestPoint Stevens, Inc., Nos. 06 Civ. 4128/4129/4130/4164; M-47, 2007 WL 2936212 (S.D.N.Y. Oct. 9, 2007). The District Court rejected the Contrarians' challenge to the Order on Remand that Aretex, as a member of the First Lien Lenders group, should not share pro rata in the proceeds from the disposition of the Securities. Id. at *1–*2.

The District Court also rejected Aretex Group's challenge to the Order on Remand that the Bankruptcy Court erred when it (1) refused to limit the order to permit Aretex to maintain control of WestPoint International; (2) determined that the First Securities distributed to Aretex were among the securities subject to sale toward satisfaction of the claims of the First Lien Lenders; (3) refused to condition any sale involving control of WestPoint International on repayment of the $187 million Aretex paid for 17.5% interest of WestPoint International; and (4) directed the release of the Securities to Beal Bank. Id. at *2–*4. To the extent Aretex argued for repayment of the $32.8 million paid in connection with the exercise of the subscription rights that

were previously distributed to it, the District Court generally agreed with Aretex and modified the Bankruptcy Court's order accordingly. Id. at *4.

Inasmuch as the Contrarians also raised objections to the Release Order, the District Court affirmed the Release Order for substantially the same reasons stated by the Bankruptcy Court. Id. at *1, *4. This timely appeal followed.

**II.    DISCUSSION**

A.    Standard of Review

In appeals from district court orders relating to bankruptcy court decisions, "we review the decision of the bankruptcy court independently, examining its conclusions of law de novo and its factual findings for clear error." In re Wireless Data, Inc., 547 F.3d 484, 492 (2d Cir. 2008) (quoting Adelphia Bus. Solutions, Inc. v. Abnos, 482 F.3d 602, 607 (2d Cir. 2007)) (internal quotation marks omitted). With limited exceptions, we review questions of textual construction de novo. See In re Duplan Corp., 212 F.3d 144, 151 (2d Cir. 2000) (stating that this Court reviews de novo questions of "pure textual construction . . . , whatever the procedural posture of the case" (quoting Bellefonte Reinsurance Co. v. Aetna Cas. and Sur. Co., 903 F.2d 910, 912 (2d Cir. 1990)) (internal quotation marks omitted)); see, e.g., Truskoski v. ESPN, Inc., 60 F.3d 74, 77 (2d Cir. 1995) (according deference to the district court's interpretation of its own order). Whether an appeal is moot is also a legal question that is reviewed de novo. N.Y. Civil Liberties Union v. Grandeau, 528 F.3d 122, 128 (2d Cir. 2008).

B.    Section 363(m) Mootness

Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

This section creates a rule of "statutory mootness," see Weingarten Nostat, Inc. v. Serv. Merch. Co., 396 F.3d 737, 744 (6th Cir. 2005), which bars appellate review of any sale

20

authorized by 11 U.S.C. § 363(b) or (c) so long as the sale was made to a good faith purchaser and was not stayed pending appeal, see In re Gucci, 105 F.3d 837, 839–40 (2d Cir. 1997) ("Gucci I"); see also In re Gucci, 126 F.3d 380, 392 (2d Cir. 1997) ("Gucci II").  By restricting the exceptions to the application of section 363(m) to an entry of a stay or a challenge to the "good faith" aspect of the sale, section 363(m) moots a broader range of cases than are barred under traditional doctrines of mootness.  See Weingarten Nostat, Inc., 396 F.3d at 742 ("Even if the appeal is not moot as a constitutional matter because a court could provide a remedy, . . . § 363(m) requires that certain appeals nonetheless be treated as moot absent a stay.").  Indeed, we have equated section 363(m) to an imposed jurisdictional limit on our authority to review the Bankruptcy Court's sale order.  See Gucci I, 105 F.3d at 838 ("We hold that . . . we have no jurisdiction to review an unstayed sale order once the sale occurs, except on the limited issue of whether the sale was made to a good faith purchaser.").

In this appeal, there is no issue with respect to the "good faith" aspect of the sale of the Debtor's assets.  See In re WestPoint Stevens, 333 B.R. 30, 40 (S.D.N.Y. 2005).  Instead, the Contrarians make two principal arguments: (1) the Stay Stipulation stayed the lien release and claim-satisfaction provisions of the Sale Order, and, therefore, any challenge to those provisions are not mooted under section 363(m), and (2) even if the lien release and claim-satisfaction provisions were not stayed, a ruling on those provisions of the Sale Order does not affect the validity of the "sale" between the actual entities involved in the purchase of the Debtor's assets, namely, WestPoint Home, WestPoint International, and the Debtor, and, therefore, any challenges to those provisions of the Sale Order are not mooted by section 363(m).  We conclude that the Contrarians' first argument is unsupported by the terms of the Stay Stipulation and that their second argument lacks merit in light of the integral nature of the lien release and claim-satisfaction provisions to the sale.  We address these arguments in reverse order.

1.      Review of the Sale Order

We have held in no ambiguous terms that section 363(m) is a limit on our jurisdiction and

21

that, absent an entry of a stay of the Sale Order, we only retain authority to review challenges to the "good faith" aspect of the sale. See Gucci I, 105 F.3d at 838, 840. Specifically, we held in Gucci I that we lack jurisdiction to review the "unstayed sale order," id. at 838 (emphasis added), of a sale subject to the protections of section 363(m) and concluded that "we may neither reverse nor modify the judicially-authorized sale," id. at 839–40 (emphasis added). We noted that it was unclear why "an appellate court . . . could not order some form of relief other than invalidation of the sale," but accepted our place in the statutory scheme and observed that "whatever other relief might be available could presumably be pursued in the bankruptcy court by those entitled to such relief." Id. at 840 n.1 (emphasis added). We adhere to our holding in Gucci I that, under section 363(m), we lack jurisdiction to review the entire Sale Order — not just the actual sale transaction. See id. at 838; United States v. Salerno, 932 F.2d 117, 122–23 (2d Cir. 1991); see also In re Parker, 499 F.3d at 621 (observing that the First, Second, Fifth, Seventh, Eleventh, and the D.C. Circuits have adopted a "per se rule automatically mooting appeals for failure to obtain a stay of the sale at issue" (citations omitted)); cf. In re Parker, 499 F.3d 616, 620 (6th Cir. 2007) ("[W]e begin by dispelling any notion that we sit in review of the bankruptcy court's Order of Sale. Defendant's attempts to assail the validity of the bankruptcy court's Order of Sale, however indirectly, are statutorily moot.").

This holding is consistent with the uniquely important interest in assuring the finality of a sale that is completed pursuant to 11 U.S.C. § 363(b) or (c) in bankruptcy proceedings.[8] See Gucci II, 126 F.3d at 387 (stating that "without this assurance of finality [under section 363(m)],

---

[8] Section 363(b) allows for the debtor to sell its property, other than in the ordinary course of business, after notice and a hearing. See 11 U.S.C. § 363(b). Because a sale pursuant to section 363(b) may deprive creditors of the safeguards of a Chapter 11 reorganization, see In re Lionel Corp., 722 F.2d 1063, 1066, 1069 (2d Cir. 1983), this Court has restricted the Bankruptcy Court's exercise of discretion in permitting a sale under section 363(b) by requiring the Bankruptcy Court to "find from the evidence presented before [it] a good business reason to grant . . . [the] application [to sell property under section 363(b)]," id. at 1071. It is uncontested in this case that the Bankruptcy Court authorized the sale of the Debtor's assets pursuant to section 363(b). Section 363(c), which allows for the sale of property in the ordinary course of business without notice or hearing, is not applicable here.

22

purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property"); see also In re Rare Earth Minerals, 445 F.3d 359, 363 (4th Cir. 2006) ("Section 363(m) codifies Congress's strong preference for finality and efficiency in the bankruptcy context, particularly where third parties are involved."). Similar to the logic that the sale price of the debtor's assets will be driven down if the purchaser is not guaranteed ownership of those assets upon closing of the sale, see Gucci II, 126 F.3d at 387, a purchaser will demand a discount for the purchase of assets in which the terms and conditions of the sale cannot be protected from challenge even after closing the sale, cf. In re Trism, Inc., 328 F.3d 1003, 1007 (8th Cir. 2003) ("[A] challenge to a related provision of an order authorizing the sale of the debtor's assets affects the validity of the sale [and therefore falls under section 363(m)] when the related provision is integral to the sale of the estate's assets.").

A narrow exception may lie for challenges to the Sale Order that are so divorced from the overall transaction that the challenged provision would have affected none of the considerations on which the purchaser relied. Cf. Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 499 (3d Cir. 1998) (stating that an appeal is not moot under § 363(m) unless the party failed to obtain a stay and reviewing courts can fashion a remedy "that will not affect the validity of the sale"). But see George W. Kuney, Slipping Into Mootness, 2007 Ann. Surv. of Bankr. L. Part I § 9, subpart III(A)(i) ("[I]t does not appear that [the Third Circuit's] 'exception' to mootness is found in many fact patterns and one is left to wonder what remedy an objecting party to a section 363 sale would be seeking that 'did not distort' the validity of the section 363 sale. . . . Given the narrowness of this exception, for most practical purposes the Third Circuit should be viewed as having adopted a de facto per se rule."). We need not here address the potential for such an exception in this case, however, because the Contrarians clearly challenge an integral provision of the Sale Order.

The lien release and claim-satisfaction provisions, in conjunction with the pro rata distribution provision and Aretex's purchase of a 17.5% interest, were essential to Aretex's

23

acquiring control of the Debtor's business because: (1) the distribution provision guaranteed that the Securities would be distributed pro rata to the First and Second Lien Lenders; (2) the lien release and claim-satisfaction provisions guaranteed that the Securities received by the individual First and Second Lien Lenders would be unencumbered by other liens; and (3) Aretex's holding of approximately 40% of the First Liens and 51% of the Second Liens guaranteed it a substantial distribution of the unencumbered Securities. In accordance with its bid, Aretex was required to purchase an additional 17.5% interest in WestPoint International, which then guaranteed it a holding of 55.5% ownership in that corporation. Even under the terms of the subsequent Stay Stipulation, which permitted the closing of the sale, the scenario least favorable to Aretex, i.e., distribution of the entirety of the Second Securities to the First Lien Lenders, would still leave Aretex owning a controlling 50.5% of WestPoint International.

Indeed, both the Sale Order and the Asset Purchase Agreement emphasize the importance of the lien release, claim satisfaction, and distribution provisions of the Sale Order to occur as a condition to the closing of the "sale." For example, the Sale Order provides that the purchasers "would not have entered into the Agreement and would not consummate the transactions contemplated thereby, . . . if the . . . Securities were not free and clear of all Interests," Interests being defined as "Liens, claims, encumbrances, and other interests." Further, under the Sale Order, "effective as of the Closing" the transfer of assets "vest[ed] . . . Aretex, the other First Lien Lenders, and to the extent applicable, the other Second Lien Lenders, with their proportionate share of [the Securities] . . . in satisfaction of their replacement lien."[9] Likewise, the Asset Purchase Agreement required that the Sale Order "find and provide, among other

---

[9] The Sale Order also stated that

at the Closing the Purchased Assets shall be transferred to the Purchaser free and clear of all Interests of any kind or nature whatsoever . . . with the Interests of the First Lien Lenders and Second Lien Lenders attaching to the Sale proceeds . . . to the same extent, validity, and priority that they attached to the Purchased Assets immediately prior to the Closing. All such Interests of any kind or nature whatsoever shall be and shall be deemed to be satisfied at the Closing upon the release (or tender of release) of such replacement collateral . . . .

24

things . . . that the Parent Common Stock and Subscription Rights purchased, retained by and/or distributed to . . . the First Lien Lenders and Second Lien Lenders shall be received and retained by each of them free and clear of all Liens, claims and encumbrances of any nature." Thus, without the lien release, claim satisfaction, and distribution provisions as integral parts, there simply could not be a "sale." Cf. In re Stadium Mgmt. Corp., 895 F.2d 845, 849 (1st Cir. 1990) (concluding that a certain condition of the sale was "integral to the sale and removing it from the sale would have adversely affected the terms of the sale").

The Contrarians' argument that control was not an essential element of Aretex's bid is belied not only by the Sale Order and Asset Purchase Agreement, but also by the record. The Debtor made it clear that it pursued a section 363(b) asset sale as a last resort because both the Contrarians and Aretex could not agree on any plan that would permit the other to control the restructured Debtor. Further, both Aretex and the Contrarians were explicit about their understanding that the winner of the auction would obtain control of the Debtor's business, noting throughout the auction the importance of "control" and referencing minority shareholder protections which would apply to the losing bidder. Indeed, that the bids were assessed by incorporating a "control premium" shows that all parties involved in the auction understood that the winning bidder would acquire control of the Debtor's business. Although Aretex's final bid did not explicitly condition the sale on obtaining control of WestPoint International, the combination of the lien release, claim satisfaction, and distribution provisions, along with the purchase of 17.5% interest, mathematically guaranteed Aretex control of WestPoint International.

The Contrarians further argue that Aretex cannot claim any protections under section 363(m) because it was not the actual entity receiving the purchased assets. This argument fails, however, because it conflates the issue of standing for the appealing party with the application of section 363(m) by a reviewing court. We repeat that we lack jurisdiction to review the Sale Order unless a stay has been entered or there is a challenge to the "good faith" aspect of the sale;

25

our jurisdiction does not depend on which entity challenges the Sale Order.[10] See Gucci I, 105 F.3d at 839–40 (stating that section 363(m) moots the appeal); see also In re The Charter Co., 829 F.2d 1054, 1056 (11th Cir. 1987) ("[A]ppellant argues that the stay requirement does not apply to a purchaser who challenges the authorization. . . . There is nothing in the language of section 363(m) to suggest that such an exception exists.").[11]

In sum, this case presents an unmistakable record of a sale for control of the Debtor's business. Throughout its litigation history — before, during, and after the auction — the main concern in this case with any plan of reorganization or section 363(b) sale was "control." The Sale Order and Asset Purchase Agreement confirm this obvious truth. The lien release, claim satisfaction, and distribution provisions of the Sale Order, in conjunction with Aretex's purchase of a 17.5% interest, are necessary for "control" to transfer from the Debtor to Aretex. Accordingly, we do not hesitate to conclude that any challenges to these integral and integrated

[10] Insofar as standing is concerned, Aretex has standing in this appeal. As explained above, the entire bankruptcy proceeding was a battle for control of the Debtor between Aretex and the Contrarians. Although the physical assets were transferred to WestPoint International/Home, the actual purchaser of the Debtor's assets was undeniably Aretex. Without Aretex, there would be no WestPoint International or WestPoint Home, which entities were created by Aretex to acquire the Debtor's assets; without Aretex, there would be no entity to purchase the 17.5% interest in WestPoint International for $187 million, which was an essential component of the winning bid; and without Aretex, the winning bid of $703.5 million — nearly $82 million more than the Contrarians' provisional bid — would not have been made. In short, Aretex is the indispensable entity behind the winning $703.5 million bid. It alone was responsible for the bid's creation, presentation, advocacy, and subsequent execution. The alleged "actual purchasers," i.e., WestPoint International and Home, by contrast, were empty shells with no purse, will, or judgment to pursue their own business interests. Any adverse decision with respect to the Sale Order directly inflicts injury on Aretex, which, in addition to being the bidder-in-fact, has already invested over $200 million in reliance of the original Sale Order. See Pac. Capital Bank, N.A. v. Connecticut, 542 F.3d 341, 350 (2d Cir. 2008) (stating that to establish standing, the plaintiff must show, inter alia, that "it has suffered an 'injury in fact' that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical"); In re Colony Hill Assocs., 111 F.3d 269, 273 (2d Cir. 1997) (stating that an "aggrieved person," one who is "directly and adversely affected pecuniarily," has appellate standing in an appeal of a bankruptcy case (internal quotation marks omitted)).

[11] Similarly, the Contrarians argue that, while section 363(m) protects the sale transaction, it has no bearing on the distribution of the proceeds of that sale transaction. Their argument on this distinction, however, misunderstands the nature of the sale protected by section 363(m). As noted above, all distributions here were integral to the sale itself.

provisions of the Sale Order do not serve to undermine the statutory mootness of this appeal as provided by section 363(m).

2. The Stay Stipulation

According to the District Court, review of the lien release and claim-satisfaction provisions of the Sale Order were not mooted by section 363(m) because the application of those provisions were stayed pursuant to the Stay Stipulation. See In re WestPoint Stevens, Inc., 333 B.R. at 40, 54–55. The District Court reasoned that because the parties had agreed to stay the allocation of the Second Securities, it necessarily stayed the lien release and claim-satisfaction provisions of the Sale Order. Id. at 40. Although we understand the District Court's concern with the merits of the contention that the Sale Order violated the several credit agreements and arguably effected a circumvention of the safeguards of a Chapter 11 reorganization proceeding, see id. at 45–54; infra Part II(D)(2), the District Court in effect read a stay of the Sale Order into the Stay Stipulation despite the lack of any basis for such a reading. See Gucci I, 105 F.3d at 840 ("[R]egardless of the merit of an appellant's challenge to a sale order, we may neither reverse nor modify the judicially-authorized sale if the entity that purchased or leased the property did so in good faith and if no stay was granted.").

As an initial matter, the Contrarians argue that we must give deference to the District Court's interpretation of the Stay Stipulation because the court "so ordered" the Stay Stipulation after considering the parties' motions and nearly two hours of oral argument. To be sure, deference is owed to a court's interpretation of its own orders, see In re Blackwood Assocs., L.P., 153 F.3d 61, 66 (2d Cir. 1998); however, such deference is only appropriate where the court drafts the order, see United States v. Spallone, 399 F.3d 415, 423 (2d Cir. 2005) (explaining the reason for deferring to a court interpreting its own order as "premised on the truism that the draftsman of a document is uniquely situated to understand the intended meaning of that document" (citation and internal quotation marks omitted) (emphasis added)). Accordingly, because the Stay Stipulation was drafted by the parties and not by the District Court, we accord

27

no deference to the District Court's interpretation of the Stay Stipulation. We review the Stay Stipulation de novo.

The Stay Stipulation provides for the withdrawal of the Contrarian and Beal Bank motion "seeking a stay of the closing of the sale by [the Debtor] to Purchasers approved by the [Sale Order]." The Stay Stipulation further recites that the parties "shall seek no other stay of the closing of the sale under the Sale Order or otherwise." The Stay Stipulation does provide for a stay limited to a single event: "the distribution of the [Second Securities] allocable to the Second Lien Lenders pursuant to the Sale Order." To this end, the Stay Stipulation provides that the distribution of the Second Securities to the Second Lien Lenders "shall be made at the closing [of the sale], but shall be held in escrow" until, inter alia, the escrowed funds are ordered to "be disbursed to the Second Lien Lenders [or further held in escrow] . . . in accordance with [a subsequent court order]." (emphasis added). "In all other respects, the distributions [of the Second Securities] shall be in accordance with the Sale Order and terms of the Asset Purchase Agreement." In short, the Stay Stipulation accomplishes two goals: it (1) permits the closing of the sale and (2) defers the allocation of the Second Securities until a proper distribution of those rights has been determined.

Significantly, nothing within the four corners of the Stay Stipulation stays the lien release and claim-satisfaction provisions of the Sale Order. This omission, however, is consistent with the purpose of the Stay Stipulation to permit the closing of the sale of the Debtor's assets. As noted above, see supra Part II(B)(1), the lien release, claim satisfaction, and distribution provisions were indispensable conditions of the sale. Thus, it is clear that in withdrawing the motion for "a stay of the closing of the sale," the Stay Stipulation permitted the transfer of assets and the lien release, claim satisfaction, and distribution to occur as a single integrated transaction. Given the centrality of the lien release and claim-satisfaction provisions to the sale, it is implausible that the Stay Stipulation would stay those portions of the sale without any explicit mention of them.

Not only does the omission of language staying the lien release and claim-satisfaction provisions of the Sale Order strongly suggest that such provisions were not stayed, but the fact that the Stay Stipulation specifies the agreed upon stay as "the stay relating to the Second Lien Distribution" also convinces us that the lien release and claim-satisfaction provisions could not have been stayed. In addition to the Second Securities, the Sale Order and Asset Purchase Agreement required the lien release and claim-satisfaction provisions to apply to all Securities, including those First Securities distributed to the First Lien Lenders. The Stay Stipulation, however, only stayed the distribution of the Second Securities. If the parties intended to stay the lien release and claim-satisfaction provisions of the Sale Order, it is unimaginable that they would have done so by agreeing to stay only the distribution of the Second Securities.

The Contrarians mount a weak response by pointing to the Stay Stipulation's provision that "[e]xcept as specifically set forth herein, the rights of all parties to this appeal . . . as to the appeal and all other disputes and matters between them . . . are expressly preserved and are not affected by this stipulation." But the Stay Stipulation withdrew the stay on the closing of the sale and replaced it with a much narrower stay of the distribution of the Second Securities. Thus, "as specifically set forth" in the Stay Stipulation, the Contrarians lost the right to seek remedies that roll back any element of the sale.

Notwithstanding the absence of support in the text of the Stay Stipulation, the Contrarians argue that "a stay of the distribution of the [Second Securities] is only meaningful if [the lien release and claim satisfaction provisions were also stayed]." That is not true, because any allocation of the Second Securities to the First Lien Lenders would result in a windfall for them. This is so because the First Lien Lenders would receive the Second Securities despite the fact that their claims have been satisfied by the uncontested value of the First Securities (approximately $488 million) already distributed to them. The Contrarians rely on a false premise that the only way the Second Securities can be allocated to the First Lien Lenders is if the lien release and claim-satisfaction provisions were also stayed. The Stay Stipulation,

29

however, contemplates the possibility of a reviewing court allocating the Second Securities, in whole or in part, to the First Lien Lenders as an independent remedy not affecting the "closing of the sale."

The Contrarians also argue that the Stay Stipulation did not limit the District Court's remedial authority to allocate the Second Securities and suggest that this remedial authority included the authority to stay the lien release and claim-satisfaction provisions of the Sale Order. The Contrarians rely on the Stay Stipulation's provision that the District Court may order "some or all of the [Second Securities] . . . [to] be distributed to the First Lien Lenders under the Intercreditor Agreement or otherwise" to support their argument that there is an "absence of any limitation or restriction on the remedies available to the district court as a result of the [Stay Stipulation]." If a mere reference to the District Court's remedial authority could supersede any specific agreements made in the Stay Stipulation, however, then the entire Stay Stipulation would not be a binding agreement between parties but merely advisory guidelines for the District Court's discretion to create a remedy. That cannot be. A general reference to the District Court's remedial authority cannot be read to nullify one of the primary goals of the Stay Stipulation — to close the sale. See Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 111 (2d Cir. 2008) (stating that "specific language in a contract will prevail over general language where there is an inconsistency between two provisions" (citing ABN Amro Verzekeringen BV v. Geologistics Ams., Inc., 485 F.3d 85, 102 (2d Cir. 2007))).

Therefore, we conclude that the District Court erred when it read the Stay Stipulation to have stayed the lien release and claim-satisfaction provisions of the Sale Order. Accordingly, in the absence of a stay (or a challenge to the good-faith aspect of the sale), section 363(m) precludes our review of the Sale Order. Because we conclude that the appeal of the Sale Order is moot pursuant to 11 U.S.C. § 363(m), we need not consider Aretex's alternative argument on the applicability of equitable mootness. Likewise, we need not consider Aretex's argument that restitution is warranted if this Court were to affirm the District Court's decision vacating the lien

30

release and claim-satisfaction provisions of the Sale Order. We reject, as without merit, the remaining arguments made by the Contrarians and Beal Bank in this appeal as they relate to statutory mootness.

C. Issues Relating to the Sale Order on Cross-Appeal

The Contrarians argue on cross-appeal that the District Court erred in two respects. First, they argue that the District Court incorrectly concluded as moot under section 363(m) the issue of whether the First Securities should have been distributed to the collateral trustee of the First Lien Lenders instead of having the First Securities directly distributed to the First Lien Lenders. The Contrarians make this alternative argument in the event this Court rules that the lien release and claim-satisfaction provisions of the Sale Order were mooted under section 363(m). Second, the Contrarians argue that Aretex, as a member of the First Lien Lenders group, waived its rights to share in the fruits of the Contrarians and Beal Bank's successful appeal at the district court level affecting the status of the Securities. Both of these arguments are without merit.

The Contrarians' first argument must be rejected because a distribution to the collateral trustee, i.e., Beal Bank, instead of a pro rata distribution to the First Lien Lenders, directly affects Aretex's obtaining control of WestPoint International. Aretex's bid for control is dependent upon its receiving a pro rata share of the distributed Securities. See supra Part II(B)(1). It is its status as a substantial but minority member of the First Lien Lenders group, combined with its other distributions and purchase of stock, that allows Aretex to become the controlling shareholder of WestPoint International. Id. Thus, the pro rata distribution of the First Securities is as much essential to the sale as the lien release and claim-satisfaction provisions of the Sale Order. Accordingly, because the Contrarians' challenge directly affects Aretex's control of the Debtor's business through WestPoint International — an integral element of the sale — it is moot pursuant to section 363(m). Id.

The Contrarians' second argument requires no consideration in light of our holding to reverse the District Court's decision pertaining to the lien release and claim-satisfaction

31

provisions of the Sale Order.

D.  Remedy

Although section 363(m) moots any challenge to the Sale Order as it relates to the closing of the sale, the Stay Stipulation explicitly stayed the allocation of the Second Securities. As we will elaborate upon below, we conclude that the original distribution of the Second Securities under the Sale Order violated the Intercreditor Agreement because the First Lien Lenders had the right to be paid in cash. Because the First Lien Lenders withdrew their appeal with respect to their right to be paid in cash, however, we find that they cannot nonetheless maintain that they should receive all of the Second Securities to the total exclusion of the Second Lien Lenders. We therefore look to both the Sale Order and the Stay Stipulation, as well as to the intent of the parties in reaching these agreements and to equity, in fashioning an appropriate allocation. To this end, three interests guide our consideration: (1) Aretex's purchase of control of WestPoint International; (2) the non-Aretex members of the Second Lien Lenders group whose rights were deemed expendable and were forced to accept the Stay Stipulation over their objection; and (3) the entry of a Sale Order whose terms violated the First Lien Lenders' rights to cash satisfaction pursuant to the credit agreements. We articulate the nature of each interest below and conclude that all three interests should be afforded a remedy to the extent practicable.

As Aretex emphasized during argument and in their briefs, any allocation of the Second Securities does not affect Aretex's obtaining control of WestPoint International. If all of the Second Securities had been allocated to the First Lien Lenders, Aretex would have obtained a total share of 50.5% of WestPoint International; if all of the Second Securities had been allocated to the Second Lien Lenders, Aretex would have obtained a total share of 55.5% of WestPoint International. Any allocation of the Second Securities which split the distribution between the First and Second Lien Lenders would have resulted in Aretex obtaining somewhere between 50.5% and 55.5% of WestPoint International's shares. Thus, Aretex expected to receive at least 50.5% and at most 55.5% of WestPoint International's shares as a result of the entire transaction

32

in light of the Stay Stipulation. At argument, Aretex did not find it strange that any Second Securities the First Lien Lenders may receive would be in addition to the First Securities already distributed to the First Lien Lenders in satisfaction of all of their claims.

Although Aretex may have little interest in whether it ends up with 50.5% or 55.5% of WestPoint International's shares because it would be guaranteed control of WestPoint International regardless of the allocation, the minority members of the Second Lien Lenders were rightly concerned about receiving nothing in the event the Second Securities were entirely allocated to the First Lien Lenders. The Stay Stipulation, which placed the allocation of the Second Securities in uncertainty, was entered over the objection of the minority members of the Second Lien Lenders group. Because the Stay Stipulation clearly contemplates that a subsequent court order may allocate none, some, or all of the Second Securities to the First Lien Lenders "under the Intercreditor Agreement or otherwise," we conclude, in accordance with the Stay Stipulation's boundaries, that the minority members of the Second Lien Lenders group should be distributed the Second Securities promised them under the Sale Order, i.e., a pro rata distribution of approximately 49% of the Second Securities. Thus, setting aside the Second Securities that must be distributed to Aretex to guarantee them 50.5% of WestPoint International's interests (approximately 40% of the Second Securities), approximately 11% of the Second Securities remain for allocation to either the First or Second Lien Lenders.

In addition to the interests of the minority members of the Second Lien Lenders group and Aretex, there are here also the interests of the First Lien Lenders whose rights to cash satisfaction were passed over in violation of the credit agreements. Although the First Lien Lenders were not powerless as were the minority members of the Second Lien Lenders group and, indeed, had contributed to their own perceived misfortune by agreeing to the Stay Stipulation, we conclude that the remaining 11% of the Second Securities should be distributed pro rata to the non-Aretex members of the First Lien Lenders group. It is appropriate that the First Lien Lenders receive some remedy for the erroneous ruling relating to the First Lien

33

Lenders' priority rights to cash payments.

The Bankruptcy Court relied on two exceptions in the Intercreditor Agreement to the requirement that the First Lien Lenders must be paid in full and in cash before payments are to be made to the Second Lien Lenders, namely, (1) adequate protection payments and (2) permitted mandatory prepayments. Neither of these exceptions apply to permit the distribution of the Second Securities to the Second Lien Lenders.[12]

Before reaching the merits of these grounds for distribution to the Second Lien Lenders, however, we address Aretex and Wilmington Trust's equitable-estoppel argument. They assert that during the bidding period the Contrarians attempted to satisfy the First Lien Lenders with equity rather than cash and, therefore, argue that the Contrarians should be estopped from challenging any subsequent transaction that satisfies the First Lien Lenders in equity rather than cash. This argument must be rejected. Although estoppel is an equitable doctrine that "cannot be reduced to a precise formula or test," its application at least requires the party against whom estoppel is being asserted to have taken clearly contrary or inconsistent positions. See Zedner v. United States, 547 U.S. 489, 504 (2006) (stating that estoppel only applies if "a party's later position [is] clearly inconsistent with its earlier position" (citation and internal quotation marks omitted)); see also Shepardson by Shepardson v. Town of Schodack, 195 A.D.2d 630, 632 (N.Y. App. Div. 1993) (stating that estoppel applies "to prevent a party from inequitably adopting a position directly contrary to or inconsistent with an earlier assumed position in the same proceeding or a prior proceeding").

Here, the Contrarians have consistently argued throughout the bankruptcy proceedings

---

[12] The Bankruptcy Court also referred to section 105(a) as one of the statutory grounds for permitting the distribution of the Second Securities to the Second Lien Lenders. Section 105(a) provides that the court may "issue any order . . . that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). We agree with the District Court in rejecting section 105(a) as a basis for justifying distributions to the Second Lien Lenders. As discussed below, the distributions were not properly justified as adequate protection under section 361; nor were the distributions "permitted mandatory prepayments" as defined under the Intercreditor Agreement. Thus, it is neither "necessary" nor "appropriate" to make distributions that are contrary to the Bankruptcy Code and the Intercreditor Agreement.

that (1) their unique status as a majority holder of the First Liens entitled them to credit bid — through Beal Bank — on behalf of the First Lien Lenders pursuant to 11 U.S.C. § 363(k); (2) because neither the Second Lien Lenders nor any other third party can be a majority holder of the First Liens, those parties cannot waive the First Lien Lenders' right to cash satisfaction; and (3) ergo, any competing bids must first satisfy the First Lien Lenders in cash. The Contrarians repeat the same arguments in this appeal, emphasizing that Aretex is in a significantly different position than the Contrarians vis-à-vis the First Lien Lenders. Indeed, the Contrarians assert — and we agree, as discussed below — that Aretex's bid structure requiring an in-kind distribution of securities in satisfaction of the First Liens was not authorized under the Intercreditor Agreement. In short, although both Aretex's and the Contrarians' bids involve an in-kind distribution of securities in satisfaction of the First Liens, we do not agree that the Contrarians, who have argued that their in-kind distribution scheme resulted after a lawful credit bid pursuant to 11 U.S.C. § 363(k), should be estopped from challenging Aretex's unauthorized bid structure.

Insofar as the Contrarians modified their bid towards the end of the auction to imitate Aretex's bid structure, they did so only after qualifying their new bid with the caveat that "we reserve our rights to claim in court that the credit bid that we made previously was higher and better." Thus, the Contrarians gave clear notice to Aretex that they were not abandoning their credit bid. See Bates v. Long Island R.R. Co., 997 F.2d 1028, 1037 (2d Cir. 1993) (explaining that estoppel is "designed to ensure fairness in the relationship between parties" (internal quotation marks omitted)). Moreover, that the Bankruptcy Court had refused to rule on the superiority of the Contrarians' credit bid before the auction — despite the Contrarians' earlier pleas that the court do so — also places the Contrarians' modification of their bid structure toward the end of the auction in a reasonable perspective. Estoppel seems especially inappropriate here because the Contrarians' new bid was never adopted as the winning bid at any time, and the Contrarians reaped no benefits from their alleged abandonment of the original credit bid. Cf. Peralta v. Vasquez, 467 F.3d 98, 105 (2d Cir. 2006) (stating that, under judicial

35

estoppel, "the party against whom it is asserted must have advanced an inconsistent position in a prior proceeding, and [] the inconsistent position must have been adopted by the court in some matter"). We thus reject Aretex and Wilmington Trust's equitable-estoppel argument.

Turning to the first exception in the Intercreditor Agreement, we agree with the District Court that "adequate protection" did not permit the distribution of the Second Securities to the Second Lien Lenders. Adequate protection is generally defined as a method by which a secured creditor may apply to the Bankruptcy Court to protect "its interests against the diminution in value of [its] security during a bankruptcy proceeding." Bluebird Partners, L.P. v. First Fidelity Bank N.A., 85 F.3d 970, 972 (2d Cir. 1996). Such adequate protection may manifest in the form of "cash payments, a lien, or such other relief as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." In re Dairy Mart Convenience Stores, Inc., 351 F.3d 86, 90 (2d Cir. 2003) (internal quotation marks and ellipsis omitted). Thus, as was the case here, permitting the sale of the Debtor's assets free and clear of encumbrances but attaching replacement liens on the proceeds of such sale to the same extent, validity, and priority as the original liens was "squarely within the letter and purpose of [adequate protection.]" See In re WestPoint Stevens, Inc., 333 B.R. at 48.

As recognized by the District Court, however, the distribution of the Securities in satisfaction of the First Lien Lenders' claims were classified as adequate protection by the Bankruptcy Court without any showing that additional adequate protection was needed. Id. at 49. Moreover, the accordance of "adequate protection" in this case resulted in the First Lien Lenders' satisfaction of their claims in non-cash proceeds in violation of their contractual rights to cash satisfaction. Thus, given the significance of the resulting injury and the less-than-clear basis for the Bankruptcy Court's distribution of the Securities as a grant of adequate protection, we conclude that those distributions were not properly justified as "adequate protection."[13] See In re

---

[13] We reject the argument that the First Securities could be distributed as adequate protection because they constituted the "indubitable equivalent" of the debts. We agree with the District Court that adequate protection "deals with the preservation of the value of a security

36

Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy." (citation and internal quotation marks omitted)); id. ("[A] proposal depending upon a pre-petition lender having adequate protection . . . should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights." (citation and internal quotation marks omitted)).

With respect to the second exception in the Intercreditor Agreement, we also agree with the District Court that the "permitted mandatory prepayments" did not authorize the distribution of the Second Securities to the Second Lien Lenders. The Intercreditor Agreement defines "permitted mandatory prepayments" as "any payment upon the Second Lien Indebtedness occurring as a result of [the Debtor's] sale . . . of the Collateral . . . to the extent that . . . any net proceeds of such sale . . . remain after application to the First Lien Indebtedness to the extent required by the Senior Credit Agreement." Section 3.15(a), (b) of the Senior Credit Agreement provides for the mandatory application to the First Lien debts of payments made in "currency" and in "immediately available funds," but does not require the application of non-cash proceeds to the First Lien Lenders' claims. Thus, because the application of the Securities to the First Lien Lenders' claims is not "required" by the Senior Credit Agreement, there remain no "net proceeds" that the Second Lien Lenders may claim as permitted mandatory prepayments.

To be sure, in addition to section 3.15(a), (b) of the Senior Credit Agreement requiring the payment of claims in cash, section 3.15(c) of the Senior Credit Agreement sets forth payment

interest and does not empower the bankruptcy court to resolve a creditor's claim." In re WestPoint Stevens, Inc., 333 B.R. at 49 n.22. Without a showing that there is some need for adequate protection, the Bankruptcy Court cannot use adequate protection as a default provision for distributing collateral to the secured creditor. See 11 U.S.C. § 361 ("When adequate protection is required under section 362, 363, or 364 . . . such adequate protection may be provided by[, inter alia,] . . . granting such other relief . . . as will result in the realization by [the secured creditor] of the indubitable equivalent of such [secured creditor's] interest in [the] property." (emphasis added)); cf. In re Bushee, 319 B.R. 542, 551 (Bankr. E.D. Tenn. 2004) ("In order to obtain relief . . . for lack of adequate protection [under 11 U.S.C. § 362(d)(1)], [the creditor] must establish[, inter alia,] . . . that cause exists justifying relief, such as the Debtors' failure to make payments or that the collateral is decreasing in value." (citation omitted)).

priorities in the event of default — including the "payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus" — of "all amounts . . . [n]otwithstanding any other provisions of [the Senior Credit Agreement]." (emphasis added). Wilmington Trust relies on this provision to argue that the "all amounts" language suggests that the "required" payments need not be restricted to cash in cases where, as here, the Debtor's assets are sold in bankruptcy proceedings. We reject Wilmington Trust's argument and agree with the District Court that section 3.15(c) "simply changes the order in which the required cash payments are to be applied in the event of a default" "rather than permitting [the Debtor] to force the creditor to take illiquid property in satisfaction of its loan payment obligations." See In re WestPoint Stevens, Inc., 333 B.R. at 46. As the District Court aptly observed:

> It taxes the imagination to suppose that a sophisticated group of creditors, such as the original bank parties to the Credit Agreement, would enter into an agreement giving them the clear contractual right to cash payments when the borrowers are complying with their obligations under the agreement, but giving the borrowers the unilateral right to substitute property in satisfaction of their payment obligations when the borrowers are in breach of the agreement.

Id.

Moreover, not only is Wilmington Trust's reading of section 3.15(c) implausible, but it is also inconsistent with the specific provisions within section 3.15(c), which provide for "all amounts" to be applied to, inter alia, "fees" — including attorneys' fees — and other administrative "costs and expenses." These references to various "fees" and administrative "costs and expenses" mean cash payments, as there is nothing in section 3.15(c) that would alter the plain understanding of these terms. See Bank of Boston Conn. v. Platz, 596 A.2d 31, 32 (Conn. Ct. Super. 1991) (observing that payment of debt "must be in money, unless the parties agree otherwise, or the obligee consents to accept some other medium of payment" (citing 60 Am. Jur. 2d Payment § 32)); 28 Williston on Contracts § 72:31 (4th ed. 2007) ("[A]bsent the agreement of the parties in advance, . . . both the tender of payment and the actual payment of a debt owed must be in lawful money."); 60 Am. Jur. 2d, Payment § 21 (providing that "[t]he general rule is that both the payment of and tender of payment of a debt must be in money[]

unless the parties agree otherwise"); cf. In re Shea, 308 A.D.2d 29, 30 (N.Y. App. Div. 2003) (observing the ethical rule prohibiting a lawyer from receiving property or security interests that are adverse to a client (citing Connecticut Rules of Professional Conduct § 1.8)); see also New York Code of Professional Responsibility, DR 5-103, N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.22 (prohibiting lawyers from acquiring a proprietary interest in the subject of the litigation); DR 5-104, N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.23 (prohibiting a lawyer from entering into a "business transaction with a client if they have differing interests therein").[14] Thus, reading section 3.15 in its entirety, we conclude that section 3.15(c) does not serve to override the requirement that the First Lien Lenders be satisfied in cash. Accordingly, the Second Securities could not have been distributed to the Second Lien Lenders as "permitted mandatory prepayments."[15]

* * * *

In light of these considerations pertaining to Aretex, the minority members of the Second Lien Lenders group, and the First Lien Lenders, we direct the District Court to remand to the Bankruptcy Court with instructions to (1) require distribution of the Subscription Rights directly to Aretex to the extent necessary to enable it to secure 50.5% of WestPoint International's common stock (approximately 40% of the Second Securities); (2) require, once the total share of the Second Securities to which the minority members of the Second Lien Lenders are entitled has been definitely ascertained (approximately 49% of the Second Securities), distribution of those Second Securities directly to the minority members in proportion to their holdings; and (3) require the distribution of the remaining rights (approximately 11% of the Second Securities) to the non-Aretex members of the First Lien Lenders. In all other respects, it is ordered that the

---

[14] All references are to the former New York Code of Professional Responsibility, which was in effect prior to the April 1, 2009 enactment of the New York Rules of Professional Conduct.

[15] Because we conclude that the distributions to the Second Lien Lenders were not authorized by the Intercreditor Agreement, we need not decide whether the lien release, claim satisfaction, and distribution provisions could be permitted under a section 363(b) sale.

39

Sale Order be reinstated consistent with this opinion.

E.    Cross-Appeal: Release Order

The Contrarians and Beal Bank argue that the District Court erred in affirming the Bankruptcy Court's Release Order, which released the adequate protection payments held in escrow pursuant to the Escrow Stipulation to the Second Lien Lenders. Determining the validity of this claim requires review of three documents: the Escrow Stipulation, Adequate Protection Order, and Intercreditor Agreement. We review these documents de novo. See In re Duplan Corp., 212 F.3d at 151; see also Spallone, 399 F.3d at 423; supra Part II(A). We conclude that the adequate protection payments held in escrow were properly released to the Second Lien Lenders.

We begin by observing that the Second Lien Lenders are entitled to adequate protection payments pursuant to the Intercreditor Agreement, Adequate Protection Order, and Escrow Stipulation. In bankruptcy proceedings, a secured creditor ordinarily has a statutory right to adequate protection payments to protect its interests against the diminution in value of its security. See 11 U.S.C. § 363(e); Bluebird Partners, L.P., 85 F.3d at 972. Here, that statutory right is referred to in the Intercreditor Agreement as an exception to the prohibition on the Second Lien Lenders from receiving any cash payments before the First Lien Lenders' claims are satisfied. In accordance with this understanding, the Bankruptcy Court entered its Adequate Protection Order implementing the rights of the Second Lien Lenders to receive adequate protection payments as protection from the diminishing value of the collateral securing its claims. The Escrow Stipulation, which was entered after the Intercreditor Agreement and the Adequate Protection Order, specifically provides that it does not affect the substantive rights of the parties to receive adequate protection: "For avoidance of doubt, nothing in this [Escrow Stipulation] was intended or shall be deemed to affect or alter the entitlement of the First Lien Lenders or the Second Lien Lenders to adequate protection under the Adequate Protection Order." In sum, the Second Lien Lenders have a statutory right to adequate protection payments;

40

these rights have not been restricted by the Intercreditor Agreement; the Adequate Protection Order implements the Second Lien Lenders' rights to adequate protection payments; and the Escrow Stipulation confirms that the Second Lien Lenders' rights to adequate protection payments have not been altered or otherwise undermined.

Notwithstanding the above, Beal Bank raises several points in support of its argument that the Second Lien Lenders were not entitled to the escrowed adequate-protection payments. First, Beal Bank refers to the Adequate Protection Order, which includes two reservations to the grant of adequate protection to the secured creditors: (1) the First Lien Lenders have a right to commence an adversary proceeding to challenge the right of the Second Lien Lenders to receive adequate protection payments to be applied towards interest rather than principal, and (2) either the First or Second Lien Lenders may seek additional or further adequate protection. To date, however, the First Lien Lenders have not commenced an adversary proceeding and, even if they did, their remedy would not be to terminate the right of the Second Lien Lenders to receive adequate protection but only to apply the Second Lien Lenders' adequate protection payments toward the Second Lien debt's principal rather than interest. Thus, the first reservation is of no importance in discerning the basis upon which the First Lien Lenders may terminate the rights of the Second Lien Lenders to receive adequate protection. With respect to the second reservation, the First Lien Lenders have not presented to the Bankruptcy Court "a diminution in value [that] had occurred in the First Lien Lenders' collateral that would have entitled the First Lien Lenders to any form of 'additional or further adequate protection.'" Moreover, assuming arguendo that the First Lien Lenders were entitled to additional adequate protection, it does not necessarily follow that the form of such adequate protection would have consisted of depriving the Second Lien Lenders of their right to adequate protection granted under the Adequate Protection Order. See 3 Collier on Bankruptcy § 361.02 (15th ed. rev. 1999) ("[W]hen property on which the entity has a lien is to be used as collateral for a loan, the entity is entitled to adequate protection as a matter of right, not merely as a matter of discretion." (citing H.R. Rep. No. 595, 95th Cong., 1st

41

Sess. 340, 343–44 (1977))).

Second, Beal Bank argues that sections 2.4(g) and 2.13 of the Intercreditor Agreement provide a right to the Second Lien Lenders to "retain and apply" cash payments for adequate protection but not a right to "receive" adequate protection payments. Thus, according to Beal Bank, where, as here, the payments are held in escrow and not yet "made," there are no adequate protection payments to which the Second Lien Lenders have a right to "retain and apply." This argument, however, must be rejected. Adequate protection is a statutory right that is taken "very seriously," and a secured creditor will not be found to have waived its right to adequate protection unless there is more than an ambiguous waiver of that right. See, e.g., In re Blackwood Assocs., L.P., 153 F.3d at 68–69 (finding that the secured creditor did not waive its rights to adequate protection where the stipulation was "not so clear as to constitute a waiver of this right"). Here, the Intercreditor Agreement makes no specific reference that the "retain and apply" provision is a limit on the Second Lien Lenders' statutory right to receive adequate protection payments. To the contrary, section 2.4(g) of the Intercreditor Agreement provides that the Second Lien Lenders may assert their rights "to adequate protection . . . in accordance with Sections 361 through 364 of the Bankruptcy Code." Our conclusion is further supported by section 2.13 of the Intercreditor Agreement, which prohibits the Second Lien Lenders from "receiv[ing]" any payments until the First Lien Lenders are satisfied in full and in cash. (emphasis added). Because the adequate protection payments are an exception to the general prohibition of cash payments to the Second Lien Lenders, it follows that the Second Lien Lenders would be permitted to "receive" adequate protection payments should the exception apply.

Third, Beal Bank relies on its erroneous reading of the Intercreditor Agreement to argue that the Escrow Stipulation placed the adequate protection payments in escrow and thus were not "made" to the Second Lien Lenders. Because the payments were not "made," Beal Bank argues, the Second Lien Lenders have no right to "retain and apply" such payments. Although this

42

argument is irrelevant in light of the above, we take note that the Escrow Stipulation demonstrates that the parties were capable of using language to release the escrowed funds to the Second Lien Lenders only after the First Lien Lenders' claims had been satisfied. Paragraph 5(a)(iii), (iv) of the Escrow Stipulation expressly provides that the priority claims of the priming liens be satisfied before the escrowed funds are released to the Second Lien Lenders The absence of a similar provision preserving the priority rights of the First Lien Lenders with respect to the escrowed funds strongly suggests that the escrowed funds were in fact adequate protection payments contemplated by the Intercreditor Agreement as an exception to the First Lien Lenders' priority rights to cash satisfaction.

Furthermore, the Escrow Stipulation's intent was to "maintain the status quo as of the date of execution of this [Escrow Stipulation]." As of the date of the execution of the Escrow Stipulation, the Second Lien Lenders were receiving their statutorily authorized adequate protection payments. To be sure, paragraph 3 of the Escrow Stipulation does provide that the adequate protection payments deposited in escrow "shall not constitute 'cash payments made by [the Debtor] as adequate protection' to the Second Lien Lenders, such that the . . . Second Lien Lenders would be 'entitled to retain and apply' such payments to indebtedness under the Second Lien Credit Facility . . . ." That provision, however, is immediately qualified, "unless and until the Release Order . . . authorizes the release of funds held [in escrow]." (emphasis added). Thus, the Escrow Stipulation does not terminate the Second Lien Lenders' rights to adequate protection but, as the Bankruptcy Court summarized, "simply deferred and conditioned the delivery of the Second Lien Interest Payments on the entry of a further Court order . . . ."

Finally, the parties make an issue of whether a lien had attached to the escrowed funds or not. Given the terms of the Release Order, however, we see no significance in these arguments. In our view, the lien was useful insofar as it provided a legal hook by which the escrowed funds might have been distributed to the First Lien Lenders in the event that it was later determined that there was a proper basis for making such a distribution. Because the subsequent court order here

43

released the funds to the Second Lien Lenders, however, any lien that may have attached to the funds while they were in escrow would be inapplicable when those funds were released to the Second Lien Lenders as adequate protection payments. This reading of the Bankruptcy Court's orders is consistent with the Escrow Stipulation's "unless and until" provision noted above and, as well, the Escrow Stipulation's purpose of maintaining the status quo with respect to the Second Lien Lenders' rights to adequate protection. If the liens continued to attach even after a determination that the Second Lien Lenders were entitled to the adequate protection payments held in escrow, then the Second Lien Lenders' rights to adequate protection payments would have fundamentally changed.

Therefore, upon review of the Intercreditor Agreement, Adequate Protection Order, and the Escrow Stipulation, we find no error in the District Court's affirmance of the Bankruptcy Court's Release Order. We find Beal Bank's remaining arguments to be without merit.

**III.    CONCLUSION**

For the foregoing reasons, the orders of the District Court are REVERSED, in part, and AFFIRMED, in part. We direct the District Court to REMAND this case to the Bankruptcy Court for further proceedings consistent with this opinion.